[Civ. No. 40339. Second Dist., Div. 4. May 15, 1973.]

EDITH E. WARRINER, Plaintiff and Appellant, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Respondent;
INDUSTRIAL CONTROL SYSTEMS,
Real Party in Interest and Respondent.

**COUNSEL**

Daniel S. Brunner for Plaintiff and Appellant.

Patricia M. Tenoso, Elena H. Ackel, Mary K. Gillespie, Bette Bardeen, Fred Okrand, Jan T. Chilton, Charles C. Marson, Joseph Remcho, Peter E. Sheehan, Larry Sleizer, Davis, Dunlap & Williams, Nancy L. Davis, Mary

C. Dunlap, Wendy W. Williams, Lowell Johnston, William Bennett Turner and Julian Fowles as Amici Curiae on behalf of Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, Edward M. Belasco and Robert M. Snader, Deputy Attorneys General, for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

## OPINION

**KINGSLEY, J.**—Petitioner Edith E. Warriner sought a writ of mandate (Code Civ. Proc., § 1094.5) directing the California Unemployment Insurance Appeals Board to set aside its decision denying petitioner unemployment insurance benefits. The trial court denied the writ, made certain findings of fact and conclusions of law, and judgment was entered accordingly. Petitioner has appealed.

The facts developed at the administrative hearing before the board referee may be summarized as follows: Mrs. Warriner, aged 60, had been employed by Industrial Control Systems for 10 years prior to her departure on November 16, 1970. In 1967 she was promoted to the position of office supervisor. At the time of her departure she was being paid $155 per week. She was a competent employee.

In 1969, she had a conversation with her immediate supervisor, Mr. Brown; the question of her eventual retirement was discussed. Mrs. Warriner was indecisive about an exact retirement date, but in response to a direct question from Mr. Brown as to how long she planned to work, she replied, "I don't really know, Mr. Brown, about a year or a year and a half." Regarding this answer she testified, "After all, I am 60 years old. Q. Your answer then is that he asked you how long you were going to work? A. What my plans were in regard to work. Q. What did you indicate, if you remember now? A. No definite time."

In the spring of 1970, Mrs. Warriner was informed by Mr. Brown that the management of Industrial Control Systems had made a policy decision that in the future office supervisors would be male office managers, and that female supervisors would be replaced. Mr. Brown discussed with her the possibility of advertising for a suitable male office manager, but apparently nothing further developed until early in November 1970. At that time, Mr. Brown told Mrs. Warriner that she was to commence training her replacement, a young man named Nelson. He had a background of

office experience, and had been with the company for six months, first as a route salesman, then for several weeks as a trainee for evaluation as an office manager. Petitioner discovered that Mr. Nelson was currently being paid more than she was, i.e., $164 per week. She complained about this, and Mr. Brown remedied this by increasing her salary to Mr. Nelson's level.

Petitioner's family, her husband and son, were concerned about the petitioner's situation at work. Petitioner's son prepared a letter setting forth terms for petitioner's future employment with the company; she attempted to have this reproduced on the company's letterhead and to obtain the signature of a company official on the document, but failed. Petitioner discussed her future with Mr. Brown. He told her that he could "personally guarantee" her six more months of employment; that on January 1, 1971, her pay would be increased to $175 per week; that she could have two additional weeks of vacation; that he estimated that it would take three or four months for her to train Nelson to replace her; that possibly she might continue with the company after the promised six months "Under Mr. Nelson or possibly during the six-month guarantee time I gave her, I may have asked her to go over to our other plant to do possibly the same thing over there, training office personnel."

Petitioner worked for a week after Mr. Nelson commenced training. She testified that she became "nervous and upset about the degradation and it was impossible for me to work." On November 17, 1970, she called Brown and said, "I was first going to try to do the job, but I couldn't do it. I was upset about being replaced and having to train somebody and the wages being more than what I was getting." She was dissatisfied "[b]ecause I had worked there for a long time. I had worked hard, and I had the company's interests at heart, and I had no complaints about my work, and I was assured that my work was all right; that this was no reflection on my work." She told Brown she would not return. Brown testified: "She said she was nervous. She said she wasn't coming back; that the pressure at home was too much, and I said, why, and she said, 'Well, both my son and husband both would rather I quit.' And at this time I asked Edith, 'Are you quitting?' And she said, 'Yes, I am' . . . ."

Petitioner then applied for unemployment insurance benefits, which are payable to those persons who are unemployed through no fault of their own. (Unemp. Ins. Code, § 100.) Determination of eligibility for benefits is made by the California Department of Human Resources Development, a state-wide agency administering the unemployment insurance program. The department denied petitioner benefits on the basis that she was disqualified from receiving them pursuant to Unemployment Insurance Code section

1256, which provides: "An individual is disqualified for . . . benefits if . . . he left his most recent work voluntarily without good cause . . ."

Petitioner appealed to an appeals board referee; she claimed she had left her employment for "good cause," i.e., sexual discrimination. The referee found for the petitioner. The appeals board reversed the referee, finding that petitioner had left work in anticipation of discharge, which is regarded, pursuant to administrative interpretation, as leaving without "good cause." (Appeals Board 6228, January 28, 1955; P.B. Benefit Decision 27.)

The trial court, denying the petitioner's writ, found that the weight of evidence in the administrative record showed: (1) that the petitioner was a competent employee; (2) that petitioner's employer had implemented a policy whereby all women occupying the position of office supervisor would be replaced by men; (3) that petitioner voluntarily quit without notice "under the emotional impulse of a feeling of injured vanity" at a time when she still had the office supervisor position; (4) that she quit due also to the urging of her husband and son; (5) that she left "regardless of the sex of her replacement as petitioner contemplated retirement due to her advanced age"; (6) that she left when she reasonably expected to be employed at increased wages and with additional employment benefits for six more months; (7) that she left because "she might have been discharged" from her position as office supervisor after three or four months; although she could continue employment at the increased wage in some "suitable and worthy" capacity for at least the balance of the six months, if not longer; (8) that she quit in anticipation of eventual discharge.

The trial court also found that it was reasonable for the petitioner's employer to make arrangements for petitioner's replacement due to (1) petitioner's advanced age; (2) petitioner's uncertainty; and (3) petitioner's indecisiveness as to how much longer petitioner would be willing to continue her employment; and (4) also because a period of at least three to four months was required just to train another to perform petitioner's duties.

The court concluded that her departure was in anticipation of eventual discharge and was not for "good cause"; that her employer's policy, specifying that all female office supervisors were to be replaced by men, does not "necessarily indicate unlawful discriminatory action in violation of Labor Code §§ 1411 and 1420,"[1] because these sections permit "classifications on the basis of sex if there is a logical and reasonable basis" for it.

---

[1]Labor Code section 1411 (amended in 1970 to include sexual discrimination) provides: "It is hereby declared as the public policy of this state that it is necessary

■ Our power of appellate review of the trial court judgment is restricted to a determination of whether the trial court, in conducting its independent de novo review of the administrative record, made findings of fact and a judgment supported by substantial, credible and competent evidence contained in that record. (*Yakov* v. *Board of Medical Examiners,* 68 Cal.2d 67 [64 Cal.Rptr. 785, 435 P.2d 553]; *Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301 [196 P.2d 20]; *Lacy* v. *California Unemployment Ins. Appeals Bd.,* 17 Cal.App.3d 1128 [95 Cal.Rptr. 566].)

■ We perceive the critical factual issue to be why the petitioner left her employment; whether it was "voluntary" within the meaning of Unemployment Insurance Code, section 1256; *and,* whether it was "without good cause." There is no dispute as to the petitioner's competence. There is no dispute that the employer was pursuing a policy of replacement based on sex; the employer representative, testifying at the administrative hearing, described that policy as "a decision of the company, orders down to me." It was incumbent on the trial court to arrive at the central, proximate cause of petitioner's termination.

We need not determine whether all of the trial court's findings of fact, or all of its conclusions of law, are correct, because the findings do determine two issues which we regard as determinative of the case at bench.

(1) Petitioner was still employed, under a promise of continued employment, at a nondiscriminatory rate of pay, for "at least" six months. There is nothing in the record before the board, the trial court or this court, to show that she necessarily would have been discharged at any time prior to a date that she might select, for herself, as an appropriate retirement date.[2] Under these circumstances, petitioner's self-termination of her employment was "voluntary" within the meaning of the act and it bars her claim unless that self-termination was for "good cause." (2) As far as we can see, the "cause" now relied on by petitioner is two-fold: (a) the deci-

---

to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement on account of . . . sex."

Labor Code section 1420 terms sexual discrimination ". . . an unlawful employment practice, *unless* based upon a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the State of California: . . ." (Italics supplied.)

While there are no California decisions interpreting section 1420's reference to a "bona fide occupational qualification" the California Attorney General's office is of the opinion that California would follow the federal position that the burden, in fair employment practices cases, is on the employer to establish that the employer practice complained of is justifiable; the bona fide occupational disqualification exception is subject to narrow construction. (55 Ops.Cal.Atty.Gen. 53 (1973).)

[2]We do not deal here with any application of a policy of compulsory retirement at an age selected by an employer.

sion to ask her to train a replacement; and (b) the selection of a male as that potential replacement.

Since, under the evidence, the training process would take three or four months, it was not improper for an employer, faced with petitioner's admitted uncertainty about her retirement date, to have someone trained to replace her when she did decide to retire.

Assuming that the adoption of a policy to replace women supervisors with male "office managers" did violate the provisions of Labor Code section 1410 et seq., the California Fair Employment Practice Act (a matter which we need not here determine), her remedy was to proceed by appropriate action to prevent the implementation of that policy and not to resign and seek unemployment compensation. The purpose of the Unemployment Insurance Code is set forth at length in section 100 of the Unemployment Insurance Code, as follows: "As a guide to the interpretation and application of this division the public policy of this State is declared as follows:

"Experience has shown that large numbers of the population of California do not enjoy permanent employment by reason of which their purchasing power is unstable. This is detrimental to the interests of the people of California as a whole.

"The benefit to all persons resulting from public and private enterprise is realized in the final consumption of goods and services. It is contrary to public policy to permit the supply of consumption goods and services at prices which do not provide against that harm to the population consequent upon periods of unemployment of those who contribute to the production and distribution of such goods and services.

"Experience has shown that private charity and local relief cannot alone prevent the effects of unemployment. Experience has shown that if the State awaits the coming of excessive unemployment it can neither create immediately the organization necessary to orderly, economical and effective relief nor bear the financial burden of relief without disrupting its whole system of ordinary revenues and without jeopardizing its credit.

"The Legislature therefore declares that in its considered judgment the public good and the general welfare of the citizens of the State require the enactment of this measure under the police power of the State, for the compulsory setting aside of funds to be used for a system of unemployment insurance providing benefits for persons unemployed through no fault of their own, and to reduce involuntary unemployment and the suffering caused thereby to a minimum.

"It is the intent of the Legislature that unemployed persons claiming unemployment insurance benefits shall be required to make all reasonable effort to secure employment on their own behalf."

It is obvious that the purpose of that act was purely economic—to provide temporary economic assistance to those who qualify under the act. An employee who, as was the case with petitioner, is still guaranteed full economic compensation by her employer does not show "good cause" for rejecting that compensation because of reduction in title or because of discrimination, legal or illegal.

The judgment is affirmed.

Dunn, J., concurred.

**JEFFERSON, Acting P. J.**—I dissent. The judgment should be reversed. The majority have determined that a competent female employee, directly affected on the job by the discriminatory practices of her employer based upon sex, may not voluntarily terminate her employment as the result of such practices and seek work elsewhere without forfeiting her right to unemployment insurance benefits payable by the state. The majority decision is erroneous because it is based upon a misinterpretation of the Unemployment Insurance Code. Furthermore, the decision raises serious constitutional questions and is contrary to public policy expressions of our Legislature. The ruling as made sets a dangerous precedent for the denial of unemployment insurance compensation to other persons who are members of minority groups and subjected to discrimination in employment.

As I understand the reasoning behind the majority's narrow construction of the Unemployment Insurance Code, it appears that they are saying that since the purpose of the legislation is to provide temporary economic assistance to the unemployed, this petitioner had no right to terminate her employment while work was still available to her "at full economic compensation" and apply for benefits, *regardless* of the attendant circumstances. I do not think the Legislature had ever intended the Unemployment Insurance Code to be interpreted in such a fashion; the existing case law certainly does not reflect the majority view.

The code *is* primarily based upon legislative concern for those persons unemployed "through no fault of their own." (Unemp. Ins. Code, § 100.) To that extent, it is economic legislation. However, it is also remedial social legislation subject to liberal construction. (*California Human Resources Dept.* v. *Java* (1971) 402 U.S. 121 [28 L.Ed.2d 666, 91 S.Ct. 1347].)

Unemployment Insurance Code section 1256, which provides for disqualification of those unemployed persons who have been guilty of work-related "misconduct" or who have left their most recent employment without "good cause" has been liberally construed. The burden of proving disqualification falls upon the employer, not the employee, when an applicant's eligibility for benefits is in dispute. (*Maywood Glass Co. v. Stewart,* 170 Cal.App.2d 719 [339 P.2d 947]; 37 Ops.Cal.Atty.Gen. 18 (1961).) The language employed in section 1256 itself conveys legislative recognition that there can be "good cause" for leaving employment *even when work is still available.* No "availability of work" limitation on "good cause" is set forth therein, and one should not be read into the section by judicial decision, as the majority attempts to do here.

"Good cause" as employed in the code has been described by the California Supreme Court as: ". . . an adequate cause, a cause that comports with the purposes of the Unemployment Insurance Code and with other laws." (Italics added.) (*Syrek v. California Unemployment Insurance Appeals Board,* 54 Cal.2d 519, 529 [7 Cal.Rptr. 97, 354 P.2d 625].) In California, "good cause" justifying termination may be work-related or due to the employee's personal circumstances. (*California Portland Cement Co. v. California Unemployment Insurance Appeals Board,* 178 Cal. App.2d 263 [3 Cal.Rptr. 37].) Reduction in wages has been held "good cause." (*Bunny's Waffle Shop v. Cal. Emp. Com.,* 24 Cal.2d 735 [151 P.2d 224].) More recently, "good cause" was found when the employment of a bearded male ended as the result of his refusal to shave off his beard upon his employer's request. The continued availability of work was not allowed to support a denial of benefits by the state, because the employee was exercising a constitutionally protected right. (*King v. California Unemployment Ins. Appeals Bd.,* 25 Cal.App.3d 199 [101 Cal.Rptr. 660].)[1] Obviously, the courts have considered circumstances other than economic in determining eligibility under the Unemployment Insurance Code. I find it

---

[1]Cf. *McCrae v. California Unemployment Ins. Appeals Bd.,* 30 Cal.App.3d 89 [106 Cal.Rptr. 159], wherein hair grown elsewhere on the head was not afforded the same First Amendment protection; McCrae was found guilty of work-related "misconduct" within the meaning of Unemployment Insurance Code section 1256 when he refused to tailor the length of his hair to meet his employer's requirements. Other cases considering the "misconduct" disqualification reflect liberal construction: mere bumbling on the job, for example, is not "misconduct"; the employee's acts must constitute a "wanton" and "wilful" disregard for the employer's interests. (*Maywood Glass Co. v. Stewart,* cited *supra.*) More recently, an employee facing a demotion, who refused to train another worker, was found not guilty of "misconduct" (*Lacy v. California Unemployment Ins. Appeals Bd.,* 17 Cal.App.3d 1128 [95 Cal.Rptr. 566]); nor was the alcoholic employee guilty of "misconduct" in *Jacobs v. California Unemployment Ins. Appeals Bd.,* 25 Cal.App.3d 1035 [102 Cal.Rptr. 364], in the absence of evidence relating his condition to poor work performance.

impossible to regard the termination of Mrs. Warriner as not for "good cause," in view of *King* and the other cases cited herein.

There are other equally important reasons why the majority decision is not well founded. It ignores the requirement that the state *must* show a "compelling interest" to protect before it may deny unemployment insurance benefits to an applicant attempting to exercise constitutional rights. The state has not shown such an interest here. On the contrary, the denial of benefits by the state, affirmed by my fellow judges, constitutes support for the discriminatory practices of the petitioner's private employer.

It seems hardly necessary to point out that under our present law, a person, including a female, does have the right not to be discriminated against in employment. That right extends not only to obtaining employment but to holding it as well, without being demoted or discharged because of discrimination. (Cal. Const., art. XX, § 18; Lab. Code, §§ 1410-1432, amended in 1970 to include *sex* as a prohibited basis for discrimination in employment; *Sail'er Inn, Inc.* v. *Kirby,* 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 47 A.L.R.3d 351]; title VII, Federal Civil Rights Act of 1964 (42 U.S.C.A. § 2000e-2(a).)

In the *King* case (25 Cal.App.3d 199, 204), it was said: "We first note that claimant is not challenging the reasonableness or validity of his discharge by the employer; he is advancing his constitutional argument only as to the state's action in denying him unemployment compensation benefits. . . .

". . . the United States Supreme Court held that the disqualifying provision of state law [South Carolina] was constitutionally defective, as it pertained to the claimant, because it operated to infringe upon her First Amendment right to free exercise of religion (*Sherbert* v. *Verner, supra,* 374 U.S. 398 at pp. 402-405 [10 L.Ed.2d 965 at pp. 969-971, 83 S.Ct. 1790] and that 'no compelling state interest' had been shown which would justify such infringement. (Citation.)"

The reasoning employed in *Sherbert* and *King* applies to the case before us as well. At the administrative hearing below, the employer freely admitted that the course of conduct pursued with respect to Mrs. Warriner was based upon a sexually discriminatory policy. No effort was made to justify it. It is obvious that the duties involved in office management are normally not of a nature which would bring the position within a bona fide occupational disqualification based upon sex. The duties are not such that only a suitable male could perform them. The employer's course of conduct resulted in the infringement of Mrs. Warriner's rights.

The fact that she had not, at the time of her departure, actually been replaced is not controlling; she had already been asked to and was engaged in training her replacement at the request of her employer, whose motivation was discrimination. Her rights had already been affected on the job. In view of these facts, and in the absence of a showing of a "compelling state interest," the state could not constitutionally deny Mrs. Warriner unemployment insurance.

Finally, the majority decision reflects social attitudes and resultant legal thinking of many years past. It certainly does not reflect the legislative expression of public policy contained in Labor Code section 1411: "It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religious creed, color, national origin, ancestry, *or sex.*" The Legislature made it abundantly clear in 1970 that it wished to end sexual discrimination in employment.

The majority have stated that the petitioner, Mrs. Warriner, should have filed charges against her employer pursuant to fair employment practices legislation. I do not disagree with that, but such action would not provide her with the economic sustenance she is entitled to pursuant to the Unemployment Insurance Code. Nothing therein requires her to file charges against her employer, and such action would not change the economic result. It is unrealistic to assume that Mrs. Warriner would have remained welcome at Industrial Control Systems after filing such charges. To suggest that under the circumstances presented here an employee must force the employer to discharge her is untenable. In any event, the employer's power to discharge is not involved in our consideration of the state's denial of compensation. If Mrs. Warriner had terminated and filed charges, she still would not have gotten unemployment insurance. If she had filed charges and been allowed to remain on the job, her personal discomfort would probably have substantially increased. The alternatives suggested are neither fair nor constitutional.

Nowhere in the *Sherbert* decision (cited *supra*) was it suggested that an applicant for unemployment insurance must "exhaust" other possible legal remedies before pursuing rights available pursuant to state unemployment insurance legislation.

The plight of this particular petitioner, Mrs. Warriner, is unfortunately not an uncommon one. She had performed competently for her employer, and the record discloses *not one act* on her part that justified the treatment she received. She was a female, however—and not a young one. The em-

ployer decided to replace her for openly expressed reasons which on their face constituted a violation of present law.

The majority refer to the "full economic compensation" Mrs. Warriner was receiving at the time of her departure. The employer's response to Mrs. Warriner's complaint about the inequity of salary vis-à-vis the young male trainee was to "remedy" the inequity by "raising" her salary to the young man's level. The response is indicative of the fact that discrimination in employment may be open, and it may also operate in more subtle ways. It should not be assumed that it is an expression of equality to compensate a female supervising employee of ten years' duration at the same rate of pay afforded to a six-month male trainee, for the same work.

I can see no justification for denying unemployment insurance benefits to this petitioner.

Appellant's petition for a hearing by the Supreme Court was denied July 12, 1973. Mosk, J., was of the opinion that the petition should be granted.