[Civ. No. 37109. First Dist., Div. Two. Apr. 5, 1976.]

MARGARET L. PRESCOD, Plaintiff and Appellant, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Respondent;
WELLS FARGO BANK, Real Party in Interest and Respondent.

**COUNSEL**

Mary C. Dunlap for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, Sheridan H. Brown and John J. Klee, Jr., Deputy Attorneys General, for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

## OPINION

**TAYLOR, P. J.**—Petitioner, Margaret L. Prescod, sought an administrative writ of mandate (Code Civ. Proc., § 1094.5)[1] directing the state Unemployment Insurance Appeals Board to set aside its decision denying her unemployment benefits. After a trial de novo in 1974, the court in the absence of findings of fact and conclusions of law[2] entered its judgment denying the writ. Prescod appeals, contending that as a matter of law, she left her employment, not "voluntarily," but for "good cause," as required by Unemployment Insurance Code section 1256, as after her return from a maternity leave of about three and one-half months, she was first refused reinstatement, then rehired in a lower grade but with the same pay, and as a result, subsequently deprived of a promotional opportunity. She urges that each of these was in violation of the requisite liberal construction of the California Unemployment Insurance Code, as well as California Labor Code section 1410 et seq., title VII of the Federal Civil Rights Act of 1964[3] (42 U.S.C. § 2000e-2(a)), and the applicable federal regulations. We have concluded that since the court below failed to consider all of the applicable law and the matter presents a question of first impression in a delicate, emerging and complex area of the law, the proper course is reversal for a new trial de novo.

The pertinent facts, revealed by the administrative record, indicate that in September 1968, Ms. Prescod began working for Wells Fargo Bank, the real party in interest, at a salary of $325 per month in a Grade 4 position. By 1970, she was employed in the credit card department as a senior clerk, at a Grade 5 position, at a salary of $520 per month. Pursuant to the bank's policy for "Maternity Leave of Absence," on May 19, 1970, she signed the document, the pertinent portions of which are set

---

[1]The record indicates that although relief was first sought pursuant to Code of Civil Procedure section 1085, Prescod's counsel agreed to proceed pursuant to Code of Civil Procedure section 1094.5 after the trial court indicated that relief would be denied under Code of Civil Procedure section 1085.

[2]It is unnecessary for us to determine whether findings of fact and conclusions of law were required in a mandamus proceeding involving the independent judgment rule (see *Savelli* v. *Board of Medical Examiners,* 229 Cal.App.2d 124, 131 [40 Cal.Rptr. 171]; *Beloin* v. *Blankenhorn,* 97 Cal.App.2d 662, 664 [218 P.2d 552]; *Hadley* v. *Superior Court,* 29 Cal.App.3d 389, 394-395 [105 Cal.Rptr. 500]). Although the notice of intended decision stated that the board was to prepare all documents required by California Rules of Court, rule 232, neither party specifically requested findings; we can only conclude that findings of fact and conclusions of law have been waived (Code Civ. Proc., § 632).

[3]Title VII was enacted on July 2, 1964, and first became effective one year later (Pub.L. No. 88-352, § 716, 78 Stats. 255).

forth below,[4] and was granted a three-and-one-half-month leave of absence from July 19 until November 1. During her absence, the bank filled her prior position in the credit card department. Upon her return, she was first refused any position and then offered one in the mail room which she refused. The record does not indicate the grade or salary level of this position, let alone whether or not it involved a loss of status. Thereafter, she was offered and accepted a position in the loan accounting department as a general data control clerk at the same salary but at Grade 4;[5] she did not regain her preleave Grade 5 status until about two years later, when in December 1972, she was advanced to senior data control clerk, a Grade 6 position; however, she was classified at a modified L-5 Grade[6] as pursuant to the bank's promotion policy, she could only move up one step at a time. From August 2, 1972, for a period of about eight months, Ms. Prescod made two requests for a transfer. After both requests were refused, and she was told she was not transferable, she resigned on April 26, 1973; her final salary was $588 a month.

The applicable state[7] and federal[8] statutes were cited to the referee, who concluded that Ms. Prescod had not left for "good cause" but

[4]"A maternity leave of absence *may be granted to an employee* who works through her sixth month of pregnancy. The maternity leave extends until two months after the estimated date of delivery. Upon the employee's return, to work, *the period of the leave of absence will count as continuous service* in satisfying the vesting requirements of the Incentive and Savings Plan, the Retirement Plan, and in determining the amount of vacation for which she is eligible. Normally insurance coverage is suspended while the employee is on leave and reinstated immediately upon her return to work without a waiting period. However, if she wishes to maintain her coverage in the Bank's Group Health and Life Plans, she may do so by paying the proper premium by the 15th of each month . . . .

"Because opportunities for placement at the end of the leave *will depend upon openings available* at that time, the employee should contact the Bank (Division Personnel Office) about two weeks before she is ready to return to work so that the Division Personnel Officer can plan for her return." (Italics supplied.)

An employee may return to work earlier than the named expiration date of her leave if she obtains a letter from her doctor clarifying her ability to resume working.

[5]The grade of an employee determines her rate of pay, level of responsibility, and opportunities for promotion, as well as annual review dates.

[6]The record is confused as to the nature of this L-5 Grade and permits an inference of an equal pay violation.

[7]The California Fair Employment Practice Act (Lab. Code, §§ 1411, 1412) since its 1970 amendment (Stats. 1970, ch. 1508, §§ 1, 2, effective Nov. 23, 1970), so far as here pertinent, recognizes the opportunity to "hold employment without discrimination because of . . . sex" as a civil right.

[8]Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq; hereafter Title VII) discussed subsequently in detail.

because she was dissatisfied with her position and the unavailability of the transfers that she had requested during the last eight months of her employment. The board affirmed the decision on August 2, 1973, indicating that discrimination had not been shown and that if Ms. Prescod felt that her employer had violated fair employment practices, she could have filed charges with the appropriate agency and continued to work.[9]

Title VII was passed to prevent the impact of racial and sexual discrimination and applies to employers in interstate commerce, including the bank. Specifically prohibited are discriminatory failures or refusals to hire, discharges, classifications and other discriminatory acts with respect to the terms, conditions or privileges of employment (42 U.S.C. § 2000e-2(a)(2), (b), (c), and (d)). Title VII also makes it unlawful to limit, segregate or classify employees in any way that would tend to deprive an employee of employment opportunities on the basis of sex (42 U.S.C. § 2000e-2(a)(2)). "The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity" (*Griggs* v. *Duke Power Co.*, 401 U.S. 424, at p. 431 [28 L.Ed.2d 158, at p. 164, 91 S.Ct. 849]).

Title VII also created the Equal Employment Opportunity Commission (EEOC) which is charged by law with the enforcement of Title VII, and gave it the authority to issue applicable guidelines for employers. These guidelines are entitled to great deference in the construction of the act (*Phillips* v. *Martin Marietta Corp.*, 400 U.S. 542, 545 [27 L.Ed.2d 613, 616, 91 S.Ct. 496]).

At the trial de novo before the court below, Ms. Prescod expressly cited the applicable federal guidelines, issued by the EEOC, which read as follows: 29 Code of Federal Regulations "§ 1604.10 [10] Employment policies relating to pregnancy and childbirth.

---

[9]This latter statement indicates the board's oversight of the contrary declared policy of both the state and federal governments, more fully discussed in footnotes 17, 18, and 19 below.

[10]Formerly 37 Code of Federal Regulations section 6837, effective April 5, 1972. The fact that these guidelines were not promulgated until after the facts of the instant case occurred is of no moment as the rights in question came into being at the time of the passage of Title VII (cf. *Rosen* v. *Public Service Electric and Gas Company* (3d Cir.) 477 F.2d 90, 94-95). In any event, the guidelines were in effect at the time of the proceedings before the referee and the board, although they were not cited. The referee found that the bank had filled Ms. Prescod's prior position in the credit card department, although no showing of any reason, much less business necessity, for doing so was presented by

"(a) *A written or unwritten employment policy or practice which excludes from employment* applicants or *employees because of pregnancy is in prima facie violation of title VII.*

"(b) *Disabilities caused* or contributed to *by pregnancy,* miscarriage, abortion, childbirth, *and recovery therefrom are, for all job-related purposes, temporary disabilities* and should be treated as such under any health or temporary disability insurance or sick leave plan available in connection with employment. *Written and unwritten employment policies and practices involving matters such as the commencement and duration of leave,* the availability of extensions, the accrual of seniority *and other benefits and privileges, reinstatement,* and payment under any health or temporary disability insurance or sick leave plan, formal or informal, shall be applied to disability due to pregnancy or childbirth on the *same terms and conditions as they are applied to other temporary disabilities.*"[11] (Italics supplied.)

In *Griggs* v. *Duke Power Co.,* 401 U.S. 424 [28 L.Ed.2d 158, 91 S.Ct. 849], also cited to the court below, the United States Supreme Court, for the first time, indicated that the guidelines of the EEOC issued pursuant to Title VII, had the force of law and expressed the will of Congress. While *Griggs* dealt with employment barriers that operated to discriminate on the basis of race, an impermissible classification, the case is pertinent here. Although the United States Supreme Court has apparently not yet clarified whether a classification based on sex is an inherently suspect[12] one, the law in California has long been otherwise (*Sail'er Inn,*

---

the bank at the hearing.

Paragraph (c) of the guidelines, which was not cited below, provides: "Where the termination of an employee who is temporarily disabled is caused by an employment policy under which insufficient or no leave is available, such a termination violates the Act if it has a disparate impact on employees of one sex and is not justified by business necessity."

[11]On March 23, 1976, the United States Supreme Court found nonappealable the order in *Wetzel* v. *Liberty Mutual Insurance Company,* and vacated 511 F.2d 199 (424 U.S. 737 [47 L.Ed.2d 435 96 S.Ct. 1202]). However, still pending is *Gilbert* v. *General Electric Co.,* Docket No. 74-1589, 74-1590, involving 29 Code of Federal Regulations section 1604.10 and a maternity leave policy that, like the one in the instant case, deprived only women employees of the opportunity to resume full-time employment with no loss of status and to return within three months of childbirth (44 U.S.L. Week 3438, argued 1/19 - 1/20/76, 44 U.S.L. Week 3427).

[12]The court did not find it necessary to do so in *Stanton* v. *Stanton* (1975) 421 U.S. 7 [43 L.Ed.2d 688, 95 S.Ct. 1373] with respect to child support on grounds of equal protection, but *Taylor* v. *Louisiana,* 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692] pertaining to the exclusion of women from juries under the fair cross-section

*Inc.* v. *Kirby,* 5 Cal.3d 1, at p. 17 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]). While *Sail'er* was decided primarily on grounds of equal protection, our Supreme Court also found (pp. 8-10) that the statute there in issue violated article XX, section 18 of the state Constitution,[13] as well as (at pp. 10-15) Title VII. In any event, Title VII represents a flat and absolute prohibition against all sex discrimination in conditions of employment, and provides relief to remedy present and continuing effects of past discrimination (*Griggs* v. *Duke Power Co., supra*; *United States* v. *Dillon Supply Company,* 429 F.2d 800; *United States* v. *Sheet Metal Wkrs. Int. Ass'n, Local U. 36,* 416 F.2d 123).

The uncontroverted evidence in the instant case indicates the following: At the proceedings before the referee, the bank indicated that the maternity leave form signed by Ms. Prescod expressed its policy that at the end of her leave she would be reinstated in any position only if there was an opening.[14] ■ This left the availability of a position at the

requirement of the Sixth Amendment, so indicates. However, in other contexts, the matter is still somewhat unclear, as in *Frontiero* v. *Richardson,* 411 U.S. 677 [36 L.Ed.2d 583, 93 S.Ct. 1764], a plurality of the court held that sex-based classifications, like racial ones, require the strict scrutiny of a compelling governmental interest test, while *Reed* v. *Reed,* 404 U.S. 71 [30 L.Ed.2d 225, 92 S.Ct. 251], required only a "rational relationship to the state objective." In any event, to date, most of the United States Supreme Court cases pertaining to maternity leave, except *Griggs, supra,* and *Wetzel, supra* (currently pending, see fn. 11 above), were determined under the equal protection or due process clauses of the Fourteenth Amendment. *Griggs* and *Wetzel,* like the instant case, involve Title VII. Petitioner here indicated that she was not proceeding on the basis of equal protection or due process; accordingly, we need not discuss either *Cleveland Board of Education* v. *LaFleur,* 414 U.S. 632 [39 L.Ed.2d 52, 94 S.Ct. 791], or *Turner* v. *Department of Employment Security* (1975) 423 U.S. 44 [46 L.Ed.2d 181, 96 S.Ct. 249] decided on grounds of equal protection and due process, as well as involving presumptions of incapacity and unavailability for employment, not in issue here. While in the federal courts there is still a recognized difference of approach in applying constitutional standards under the equal protection clause and in the statutory construction of the "sex blind" mandate of Title VII, the same is not true in this state in view of *Sail'er.*

[13]The constitutional provision, so far as pertinent before 1970, provided that "No person shall, on account of sex, be disqualified from entering upon or pursuing any lawful business, vocation, or profession." At the November 3, 1970, general election, it was slightly amended to its present version: "A person may not be disqualified because of sex, from entering or pursuing a lawful business, vocation, or profession." This constitutional provision was also apparently overlooked in all of the proceedings below.

[14]In 1970, the EEOC ruled that an employer had the burden of proving that a position could not be temporarily filled while an employee went on a maternity leave of reasonable length and duration (EEOC Dec. No. 71-562, 1973, CCH EEOC Dec. No. 116184). The fact that the form signed by Ms. Prescod was entitled "Maternity Leave" may also indicate that the bank had a different policy for maternity leaves than for leaves for other kinds of temporary disabilities. There was no evidence that Ms. Prescod's

total discretion of the employer, a clear violation of the applicable EEOC guideline, 29 Code of Federal Regulations, section 1604.10, quoted above. However, she was first refused reinstatement, then offered a job that she turned down, and finally was rehired in a Grade 4 position, one grade lower than the Grade 5 position she held before her maternity leave. After her return, it took two years[15] for her to again reach Grade 5; as a result, she was subsequently denied a promotion to Grade 6 as the bank's promotion policy prohibited a two-step move. Furthermore, although at the time of her termination she was working at a position classified at a modified Grade 5, the work was, in fact, at Grade 6. ■ The fact that she was rehired in a position at the lower Grade 4 and consequently did not have the same promotional opportunities she had before her maternity leave at Grade 5, established a prima facie violation of the guidelines. As the bank introduced no proof of any business necessity in support of its discriminatory policy, we must, therefore, assume that no justification exists (cf. *Satty* v. *Nashville Gas Company,* 384 F.Supp. 765, 771). This violation of the applicable EEOC guidelines was not considered by the court below. ■ Before the superior court where an applicant's eligibility for unemployment insurance is in issue, the burden of disqualification is on the employer and not

---

rehirement at a lower grade position was on the same terms as applied to other employees. The bank presented no evidence indicating that its policy and practices also resulted in similar denials of reinstatement and rehires at lower grade or salary levels for male employees after a temporary disability leave. There was no indication that for other leaves or temporary disabilities, employees were required to give prior notice thereof within a specified period of time. Pregnancy, as a temporary disability, must be treated no differently than any other disability. We are not requiring the bank to give to women any more than it already gives to men. In cases that have dealt with Title VII, courts have held that any policy that operates to totally exclude women is violative of the statute (*Willingham* v. *Macon Telegraph Publishing Company,* 482 F.2d 535; *Sprogis* v. *United Air Lines, Inc.,* 444 F.2d 1194; *Weeks* v. *Southern Bell Telephone & Telegraph Company,* 408 F.2d 228). In essence, .the record here indicates that the bank has two leave policies—one for pregnancy and one for other temporary disabilities. Since pregnancy is a disability common only to women, to treat it differently by applying a separate leave policy is sex discrimination, flatly prohibited by Title VII.

[15]Arguably, Ms. Prescod waived all of her rights by signing the bank's maternity leave form and taking advantage of the policy; in addition, her conduct in acquiescing in the reduced grade for over two years may constitute waiver. However, it is well settled that, like other important rights, the Title VII rights of an employee can only be waived knowingly and voluntarily (*Alexander* v. *Gardner-Denver Co.,* 415 U.S. 36, fn. 15 at p. 52 [39 L.Ed.2d 147, at p. 160, 94 S.Ct. 1011]). The record does not indicate that this was the case here. Further, as indicated above, Title VII was designed to remedy the continuing effects of past discrimination. Also, the language of the form signed is somewhat ambiguous and does not clearly indicate that reinstatement is at the sole discretion of the employer, who drafted the policy. In any event, whether a waiver was knowing and voluntary is a question of fact for the trial court that also was clearly not considered here in the light of the applicable law and federal guidelines.

the employee (*Maywood Glass Co.* v. *Stewart,* 170 Cal.App.2d 719 [339 P.2d 947]; 37 Ops.Cal.Atty.Gen. 18).

We turn next to the questions of state law.

Unemployment Insurance Code section 1256 provides, so far as pertinent here, that "An individual is disqualified for unemployment compensation benefits if the director finds that he left his most recent work *voluntarily without good cause. . .*" (Italics supplied.) The board argues that since the administrative record established that Ms. Prescod left voluntarily, our scope of review is confined to an inquiry of whether the superior court's judgment on the issue of good cause is supported by substantial evidence (*Yakov* v. *Board of Medical Examiners,* 68 Cal.2d 67, 72 [64 Cal.Rptr. 785, 435 P.2d 553]).

But, "the scope of appellate review may be dilated by viewing the issue as one of law rather than fact. Many issues might with equal force be classed as questions of law or questions of fact. [Citations.] *In the allocation of adjudicative functions the application of a legal principle or rule to undisputed facts is said to be a question of law for the appellate courts.* [Citations.] That concept supplies an argument for assigning the present issue to the law category. In contrast, instances are legion in which the reviewing court discerns a question of fact, not of law, when opposing inferences may reasonably be drawn from nonconflicting evidence. [Citations.]" (*Lacy* v. *California Unemployment Ins. Appeals Bd.,* 17 Cal.App.3d 1128, at p. 1134 [95 Cal.Rptr. 566]; italics supplied).

■ Thus, the determination whether undisputed facts established a voluntary leaving without good cause, as defined by Unemployment Insurance Code section 1256, is a conclusion of law which is subject to judicial review (*Abud* v. *Department of Employment,* 14 Cal.App.3d 405, 407 [92 Cal.Rptr. 446]; *Barrett* v. *Cal. Unemp. Ins. Appeals Bd.,* 190 Cal.App.2d 854, 860 [12 Cal.Rptr. 356]). The ultimate interpretation of a statute is an exercise of judicial power (*Bodinson Mfg. Co.* v. *California E. Com.,* 17 Cal.2d 321, 326 [109 P.2d 935]). Here, we have a situation where both the administrative agency and court have not taken into account a considerable body of applicable law.

The board relies on *Warriner* v. *Unemployment Ins. Appeals Bd.,* 32 Cal.App.3d 353 [108 Cal.Rptr. 153], wherein the Second District held that proof of sex discrimination did not constitute "good cause" within the meaning of section 1256. In *Warriner,* a woman left after being

demoted and replaced by a man whom she was then asked to train pursuant to a new policy of her employer. In affirming the denial of unemployment benefits, the court stated: "Assuming that the adoption of a policy to replace women supervisors with male 'office managers' did violate the provisions of Labor Code section 1410 et seq., the California Fair Employment Practice Act (a matter which we need not here determine), her remedy was to proceed by appropriate action to prevent the implementation of that policy and not to resign and seek unemployment compensation. The purpose of the Unemployment Insurance Code is set forth at length in section 100 of the Unemployment Insurance Code . . . ." (*Warriner,* p. 359.)

"It is obvious that the purpose of that act was purely economic—to provide temporary economic assistance to those who qualify under the act. An employee who, as was the case with petitioner, is still guaranteed full economic compensation by her employer does not show 'good cause' for rejecting that compensation because of reduction in title or because of discrimination, legal or illegal." (*Warriner,* p. 360.)

■ Although an opinion of an appellate court in another district may be persuasive, it is not controlling (*Auto Equity Sales, Inc.* v. *Superior Court,* 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]; *In re Hadley,* 57 Cal.App.2d 700, 703 [135 P.2d 381]), even where, as in *Warriner,* a petition for a hearing is subsequently denied by our Supreme Court (see cases cited in 6 Witkin, Cal. Procedure (2d ed.) Appeal, § 670, pp. 4583-4584); the denial of a hearing is not to be taken as an expression of opinion or authoritative approval, and does not have the authoritative effect of one of its own decisions (cf. *People* v. *Triggs,* 8 Cal.3d 884, 890 [106 Cal.Rptr. 408, 506 P.2d 232]).

We regard *Warriner* as unpersuasive and not controlling as its interpretation of "good cause" is inconsistent with existing law and the result reached was contrary to the purpose of unemployment insurance legislation, as well as federal and state policy expressions regarding employment discrimination.[16]

---

[16]While the *Warriner* court chose to deal with the applicable provisions of the state Fair Employment Practice Act, there is no indication that there, as here, Title VII was raised as applicable to the employer or considered by the court. As Ms. Warriner was sixty years old and within six months of retirement and still employed under a promise of continued employment for the six-month period of time involved, as the trial court found, our Supreme Court had a factually distinguishable basis for denying a hearing.

The stated policy of unemployment insurance legislation (Unemp. Ins. Code, § 100) is *to relieve the burden caused by unemployment* (*Cal. Portland Cement Co.* v. *Cal. Unemp. Ins. Appeals Board,* 178 Cal.App.2d 263, 269 [3 Cal.Rptr. 37]). ■ The provisions of the Unemployment Insurance Code must be liberally construed to further the legislative objective of *reducing the hardship of unemployment* (*Gilles* v. *Department of Human Resources Development,* 11 Cal.3d 313, 325 [113 Cal.Rptr. 374, 521 P.2d 110]; *Gibson* v. *Unemployment Ins. Appeals Bd.,* 9 Cal.3d 494, 499 [108 Cal.Rptr. 1, 509 P.2d 945]). Thus, the purpose of the unemployment act was not "purely economic," as stated without authority in *Warriner* at page 360, *but also remedial* (*California Human Resources Dept.* v. *Java,* 402 U.S. 121 [28 L.Ed.2d 666, 91 S.Ct. 1347]). The language of section 1256 itself recognizes there can be "good cause" even when work is still available. ■ All that is required is ". . . an adequate cause . . . that comports with the purposes of the Unemployment Insurance Code and with other laws" (*Syrek* v. *California Unemployment Insurance Appeals Board,* 54 Cal.2d 519, 529 [7 Cal.Rptr. 97, 354 P.2d 625]). Furthermore, our courts, while not bound, cannot overlook the applicable federal law in a significant and emerging area, such as sex discrimination, which is clearly established as a "suspect classification" in this state. A long line of well settled cases (either overlooked or ignored in *Warriner*)[17] indicate that "good cause" justifying termination may be due to the employee's personal circumstances.

Thus, in several instances, the courts have found that although an individual left work voluntarily, he did so with "good cause," based on grounds less compelling than sex discrimination. In *Bunny's Waffle Shop* v. *Cal. Emp. Com.,* 24 Cal.2d 735 [151 P.2d 224], our Supreme Court held

---

[17]Further, *Warriner*, discussed above, as indicated in the dissent by Justice Jefferson, leaves an employee who had suffered discrimination with two equally untenable alternatives: 1) remaining at work and suffering further discrimination, or possible retaliation if an employment discrimination claim is filed with the appropriate state or federal agency; or 2) leaving the position and forgoing unemployment benefits while seeking new work.

The first alternative is contrary to the declared policy of both the federal and state governments with respect to employment discrimination. Labor Code section 1411 declares it to be the public policy of the state "that it is necessary to protect and safeguard the right and opportunity of all persons to . . . hold employment without discrimination or abridgement on account of . . . sex." As to the second, the denial of unemployment benefits to an individual who left work rather than be subject to unlawful discrimination is hardly in keeping with the public policy declared by this statute or more importantly, article XX, section 18 of the state Constitution (quoted above at fn. 13).

that there was "good cause" where the employer had instituted a 25 percent wage cut (at p. 743), and in *Syrek v. California Unemployment Insurance Appeals Board,* 54 Cal.2d 519 [7 Cal.Rptr. 97, 354 P.2d 625], that there was "good cause" to refuse available work where the individual could not conscientiously subscribe to a loyalty oath that was a required condition of the position refused.[18]

Surely, then, where one's work is made intolerable over a period of time by the discriminatory acts of the employer, such as the refusal to reinstate, demotion in grade and loss of promotional opportunity, as in the instant case, there is good cause for leaving employment. Assuring an individual unemployment benefits in such situations does insure him against the impact of leaving adverse working conditions not voluntarily created by him and thus comports with the purposes of the unemployment insurance laws.[19]

---

[18]It is well settled that unemployment benefits cannot be denied where the applicant has been discharged for constitutionally protected conduct (*Sherbert v. Verner,* 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790]). Thus, in *King v. California Unemployment Ins. Appeals Bd.,* 25 Cal.App.3d 199 [101 Cal.Rptr. 660], this court (Division Four) held that benefits could not be denied to one who was discharged for refusing to shave off his beard. Noting that the wearing of a beard is symbolic conduct entitled to constitutional protection, the court held "the state is constitutionally inhibited from denying unemployment compensation benefits to an applicant who has been discharged from employment because of personal action which is constitutionally protected. . ." (P. 206; see also *Thornton v. Department of Human Resources Dev.,* 32 Cal.App.3d 180 [107 Cal.Rptr. 892] (beard); and *McCrae v. California Unemployment Ins. Appeals Bd.,* 30 Cal.App.3d 89 [106 Cal.Rptr. 159] (long hair)). Thus, our state Constitution establishes a rule that there shall be no legislation which directly or indirectly works to disqualify an individual from pursuing employment because he or she possesses any of the characteristics mentioned in the section (*Sail'er Inn, supra,* p. 8; *Matter of Maguire,* 57 Cal. 604, 608). Further, as also indicated, the opportunity to hold employment without discrimination based on sex was declared a civil right by the Legislature in 1970 (Lab. Code, § 1412).

[19]In the light of these existing statutory and constitutional provisions, the recent addition of Unemployment Insurance Code section 1256.2 can only be regarded as declaratory of existing rather than new law. The parties so indicated in their written replies to questions from this court. The statute, effective January 1, 1976, reads as follows: "An individual who terminates his employment shall not be deemed to have left his most recent work without good cause if his employer operated so as to deprive him of equal employment opportunities because of that individual's race, color, religious creed, sex, national origin, ancestry, or physical handicap, except that this section shall not apply:

"(a) To a deprivation based upon a bona fide occupational qualification or applicable security regulations established by the United States or this state.

"(b) If the individual fails to make reasonable efforts to provide the employer with an opportunity to remove any unintentional deprivation of the individual's equal employment opportunities." (Stats. 1975, ch. 715.)

Furthermore, also overlooked below, but established in response to questions from this court, the instant situation was also covered by Executive Order 11246, amended in 1970 to include sex discrimination (42 U.S.C. § 2000e). ██ Banks, like the real party in interest here, are federal depositories and are subject to Executive Order 11246, as amended (31 C.F.R. §§ 202-203; 41 C.F.R. § 60-20.3(g)), and the applicable guidelines under the executive order specifically provided, so far as here pertinent: "(1) Women shall not be penalized in their conditions of employment because they require time away from work on account of childbearing. When, under the employer's leave policy the female employee would qualify for leave, *then childbearing must be considered by the employer to be justification for leave of absence for female employees for a reasonable period of time. . . .* The conditions applicable to her leave (other than the length thereof) and to her return to employment, shall be in accordance with the employer's leave policy.

"(2) *If the employer has no leave policy,* childbearing must be considered by the employer to be a justification for a leave of absence.... *Following childbirth, and upon signifying her intent to return within a reasonable time, such female employee shall be reinstated to her original job or to a position of like status and pay, without loss of service credits.*" (Italics supplied; 41 C.F.R. § 60-20.3(g), 35 C.F.R. § 8888, effective June 9, 1970.)

Executive orders have the force of law and the express reference in Title VII to an executive order prescribing fair employment practices for government contractors indicates that Congress contemplated continuance of the executive order program (*Contractors Ass'n of Eastern Pa.* v. *Secretary of Labor,* 442 F.2d 159, 171, cert. den., 404 U.S. 854 [30 L.Ed.2d 95, 92 S.Ct. 98]). This court is required to take judicial notice of and apply the law of the United States where federal law clearly supersedes or comports with state law. Unfortunately, the record is barren as to the bank's written and other policies pertaining to leave and temporary disabilities at the time Ms. Prescod was rehired. Arguably, a policy that leaves the availability of any position in the sole discretion of the employer and without reference to "business necessity," as was the case here, would not qualify as such under the above guidelines and the employer may have been subject to 41 Code of Federal Regulations section 60-20.3(g)(2), quoted above. Even without conceding that there was a leave policy and the employer subject only to 60-20.3(g)(1), quoted above, in any event, Ms. Prescod was penalized after her return to work

by the demotion in grade and subsequent denial of promotional opportunity.

The judgment is reversed and the case is remanded for retrial in conformance with the principles enunciated in this opinion.

Kane, J., and Rouse, J., concurred.

The petition of the defendant and respondent for a hearing by the Supreme Court was denied June 2, 1976.