[S.F. No. 24449. June 6, 1983.]

MARY TERESA NORMAN, Plaintiff and Respondent, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD,
Defendant and Appellant;
EMPLOYMENT DEVELOPMENT DEPARTMENT,
Real Party in Interest and Appellant.

[redacted]

**COUNSEL**

George Deukmejian, Attorney General, Charlton G. Holland and Asher Rubin, Deputy Attorneys General, for Defendant and Appellant and for Real Party in Interest and Appellant.

Robert J. Shull and Cynthia L. Rice for Plaintiff and Respondent.

Frederick Charles Hertz and Leonard Graff as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**RICHARDSON, J.**—Does the voluntary termination of one's employment in order to follow a nonmarital "loved one" to another location constitute "good cause" for purposes of determining eligibility to receive unemployment compensation benefits? (See Unemp. Ins. Code, § 1256; further statutory references are to this code unless otherwise indicated.) Concluding that it does not, we will reverse the trial court's judgment which sets aside a decision of the Unemployment Insurance Appeals Board (Board) denying unemployment compensation benefits.

Section 1256 provides in relevant part: "An individual is disqualified for unemployment compensation benefits if the director finds that he left his most recent work voluntarily without good cause . . . ." We apply this standard to the record before us.

On January 4, 1979, plaintiff commenced her employment with Mohawk Data Sciences Corp. in California. In July 1979, plaintiff's boyfriend, with whom she had been living, found employment in the State of Washington. Plaintiff thereupon gave notice to her employer that she intended to quit her job as of September 7, 1979, in order to move to Washington to join him.

Plaintiff inquired about work in Washington before leaving California but was told that no positions were available. She nonetheless felt that she could obtain employment and moved as she had intended. After her further job search was unsuccessful she filed a claim for unemployment compensation benefits with the California Employment Development Department (Department). On October 4, 1979, she was informed by Department that she was ineligible to receive benefits because "There was no compelling reason for the move," and therefore there was no "good cause" for leaving her work with Mohawk.

During the hearing of her administrative appeal, plaintiff acknowledged that she had no definite job prospects in Washington and had left her position "Because my fiance was moving to Washington and I moved up here with my fiance." In her words, the "sole reason" she quit work was to join her fiance and "it kind of put me on the spot, either come up here and live with him up here in Washington or to break up." Plaintiff further testified that in January 1979 she and her fiance decided to marry in June 1980. She did not, however, represent that her marriage was imminent, that her presence in Washington was required to prepare for the wedding, or, indeed, that she had any definite or fixed marital plans.

The administrative law judge found that plaintiff's reasons for leaving her employment did not constitute "good cause." On appeal, the Board affirmed. Plaintiff then petitioned for a writ of mandate in the superior court. (Code Civ. Proc., § 1094.5.) While adopting the findings of fact of the administrative law judge, the trial court held that plaintiff had voluntarily quit with good cause, and that the absence of any marital relationship did not, as a matter of law, preclude an award of unemployment compensation benefits. The Board and the Department appeal.

In section 100, the Legislature described its policy underlying the creation of an unemployment insurance system as "providing benefits for persons unemployed through no fault of their own, and to reduce involuntary unemployment and the suffering caused thereby to a minimum." It has been said that in deter-

mining whether an employee has "left work voluntarily" within the meaning of section 1256, "the cases have not given that phrase its literal meaning. An employee need not actually choose to be unemployed; it is enough that his unemployment is the result of his own fault—a willful act causing or instigating his unemployment. [Citations.]" (*Evenson* v. *Unemployment Ins. Appeals Bd.* (1976) 62 Cal.App.3d 1005, 1016 [133 Cal.Rptr. 488].) However, a voluntary departure does not disqualify an employee from benefits so long as "good cause" is shown which we have defined very generally as "an adequate cause, a cause that comports with the purposes of the [California] Unemployment Insurance Code and with other laws." (*Syrek* v. *California Unemployment Insurance Appeals Board* (1960) 54 Cal.2d 519, 529 [7 Cal.Rptr. 97, 354 P.2d 625]; *Sanchez* v. *Unemployment Ins. Appeals Bd.* (1977) 20 Cal.3d 55, 70 [141 Cal.Rptr. 146, 569 P.2d 740].) One court has suggested that "Good cause may exist for personal reasons but those reasons must be so imperative and compelling as to make the voluntary leaving 'involuntary.' [Citation.]" (*Evenson* v. *Unemployment Ins. Appeals Bd., supra,* 62 Cal.App.3d at p. 1016.)

Former section 1264, repealed in 1976, had provided that an employee who left "employment to be married or to accompany his or her spouse to join her or him at a place from which it [was] impractical to commute" was deemed *in*eligible for benefits unless the individual at the time of his or her voluntary departure and filing of the claim was "the sole or major support of his or her family." The repeal of this section followed the decision of the Court of Appeal in *Boren* v. *Department of Employment Dev.* (1976) 59 Cal.App.3d 250 [130 Cal.Rptr. 683]. *Boren* held that the effect of section 1264 was to disqualify improperly a group of claimants from certain benefits without any demonstration by the state of a compelling governmental interest justifying the discriminatory statutory classification.

Under former law, even the marriage state and respect for the obligations deriving therefrom did not, standing alone, constitute good cause for termination from work. Thus, in *Douglas* v. *Unemployment Ins. Appeals Bd.* (1976) 63 Cal.App.3d 110 [133 Cal.Rptr. 604], unemployment insurance benefits were denied when, knowing that she had no guarantee of reemployment, a wife left her former employment in order to accompany her husband who had been assigned to the State of Washington for three months. (See also, *In re Kerekes,* Cal. Unemp. Ins. App. Bd. Precedent Benefit Dec. No. P-B-26 (1968). [Decision pursuant to § 409 which permits the board to designate certain decisions as precedents thereafter controlling as to referees and the director.] Wife was denied benefits where evidence established (1) she intended to leave area before her marriage, (2) marriage occurred soon before wife left employment, and (3) wife wanted to move and did not move simply to accompany husband.)

■ Whether or not there is "good cause" is an issue of law. (*Perales* v. *Department of Human Resources Dev.* (1973) 32 Cal.App.3d 332, 336 [108 Cal.Rptr. 167].) ■ In this connection, plaintiff relies heavily upon *Marvin* v. *Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106], and the appellate decision in *Department of Industrial Relations* v. *Workers' Comp. Appeals Bd.* (1979) 94 Cal.App.3d 72 [156 Cal.Rptr. 183], in arguing that her nonmarital relationship is the equivalent of a marriage for purposes of determining "good cause." We conclude otherwise.

In *Marvin,* we emphasized the property rights of nonmarital partners when their relationship terminated, holding that "adults who voluntarily live together and engage in sexual relations are nonetheless *as competent as any other persons to contract* respecting their earnings and property rights. . . . So long as the agreement does not rest upon illicit meretricious consideration, the parties may order their economic affairs as they choose, and no policy precludes the courts from enforcing such agreements." (18 Cal.3d at p. 674, italics added.) As to the marital relationship, however, we carefully emphasized that "the structure of society itself largely depends upon the institution of marriage, and nothing we have said in this opinion should be taken to derogate from that institution." (P. 684.) The essence of *Marvin* thus was that nonmarital partners were not *barred* by virtue of their relationship from asserting those contractual rights and remedies which are available to other persons.

Similarly, in *Department of Industrial Relations* v. *Workers' Comp. Appeals Bd., supra,* 94 Cal.App.3d 72, the issue was a nonmarital partner's entitlement to death benefits. Labor Code section 3503 provides "No person is a dependent of any deceased employee unless in good faith a member of the family or household of the employee . . . ." There was substantial evidence that the claimant had been a member of the decedent's household and at least a partial dependent. After reviewing *Marvin,* and the implications flowing from the repeal of former Penal Code section 269a, which had made living "in a state of cohabitation and adultery" a criminal offense, the appellate court held that the nonmarital partner was a "good faith" member of the deceased employee's household and dependent upon the employee. The survivor's unmarried relationship with the decedent did not bar her from benefits to which she was otherwise entitled under the statute.

Recent appellate opinions have recognized the limitations of *Marvin* and have declined to equate a nonmarital relationship with marriage. Thus, in *People* v. *Delph* (1979) 94 Cal.App.3d 411 [156 Cal.Rptr. 422, 4 A.L.R.4th 416], the court was examining the term "spouse" within the "marital communications" privilege. (Evid. Code, §§ 970, 980.) In declining to extend this privilege to nonmarital partners, the court accurately characterized *Marvin* as providing: ". . . a method for equitable resolution of property disputes in situations where

the parties not only carried on a relationship that, except for the formal ceremony, was marriage-like, but where they also entered into an implied contract or agreement as to ownership of property, thus protecting the reasonable expectations of the parties. This in no way signals a general elevation of meretricious relationships themselves to the level of marriages for any and all purposes. It is for the Legislature to determine whether such relationships, because of their commonness in today's society or for other policy reasons, deserve the statutory protection afforded the sanctity of the marriage union." (P. 416, fn. omitted.)

Similarly, in *Harrod* v. *Pacific Southwest Airlines, Inc.* (1981) 118 Cal. App.3d 155 [173 Cal.Rptr. 68], and in *Garcia* v. *Douglas Aircraft Co.* (1982) 133 Cal.App.3d 890 [184 Cal.Rptr. 390], judgments were affirmed which barred a surviving nonmarital partner from asserting a cause of action for wrongful death under section 377 of the Code of Civil Procedure. Subdivision (b) of this section defines "heirs" who may bring such actions as including heirs at law or those who would take in intestate succession, putative spouses, children of putative spouses, step-children, parents, and minors living in decedent's household. The *Garcia* court noted that, in response to our holding that step-children could not bring such actions (*Steed* v. *Imperial Airlines* (1974) 12 Cal.3d 115 [115 Cal.Rptr. 329, 524 P.2d 801, 68 A.L.R.3d 1204]), the Legislature had amended the statute specifically to include such persons. The court stressed that "The Legislature has manifested its intent, notwithstanding *Marvin,* not to expand the classification of persons entitled to recover to include meretricious spouses," because no similar amendment on their behalf had been enacted. (*Garcia* v. *Douglas Aircraft Co., supra,* 133 Cal.App.3d at p. 894.)

Both the *Harrod* and *Garcia* courts examined and rejected claims that section 377 denied equal protection and due process of law, the *Harrod* court holding: "The Legislature could reasonably conclude a relationship which the parties have chosen not to formalize by marriage lacks the necessary permanence to allow the survivor to recover damages for wrongful death—damages which look to the future and are intended to compensate for future loss. In addition, an action based on a meretricious relationship presents greater problems of proof and dangers of fraudulent claims than an action by a spouse or putative spouse. Finally, the exclusion of meretricious spouses is reasonably related to the state's legitimate interest in promoting marriage. [Citation.]" (*Harrod* v. *Pacific Southwest Airlines, Inc., supra,* 118 Cal.App.3d at p. 158; *Garcia* v. *Douglas Aircraft Co., supra,* 133 Cal.App.3d at p. 895.)

This last concern was echoed by us most recently in *In re Cummings* (1982) 30 Cal.3d 870 [180 Cal.Rptr. 826, 640 P.2d 1101], wherein we sustained the validity of prison regulations which limited overnight visitation privileges to members of an inmate's "immediate family." We found that such restrictions

were neither unreasonable nor arbitrary, emphasizing that: "The prolonged personal and intimate contact afforded prisoners is limited to those persons with whom the prisoner has a readily provable, legally cognizable, traditional family relationship. . . . To recognize other 'alternative' relationships as justifying 'family' visitation is an invitation into semantic quicksand. Moreover, it would encourage subterfuge." (P. 873.) We specifically noted the difficulty, in the absence of a recognized formal tie, of assessing the truth of an inmate's assertion regarding his family status (p. 874), a concern equally applicable here.

Nothing in plaintiff's unmarried state *precludes* her from receiving benefits to which she would otherwise be entitled. The Legislature's decision to give weight to marital relationships in the determination of "good cause" supports public policy encouraging marriage and is a reasonable method of alleviating otherwise difficult problems of proof.

Finally, our review of recent legislative and administrative amendments which touch on marital relationships and their effect on a "good cause" determination contributes additional support to our conclusion that the legislative scheme is not intended to accord the same weight to nonmarital arrangements.

The Legislature's recent amendments to sections 1030 and 1032 indicate that the Board's treatment of nonmarital relationships conforms to legislative intent. In not charging an employer's reserve account when an employee leaves for maritally related reasons, the Legislature thus has singled out such non-work-related terminations as special cases but has declined to extend similar protection to the employer in nonmarital situations.

Moreover, regulations which were promulgated in 1980, while not binding in this case, are instructive in our interpretation of legislative intent. ■ Ordinarily, we give great weight to the interpretation of a statute by the administrative agency empowered to promulgate regulations to advance its purpose unless the interpretation is clearly erroneous. (See, e.g., *Judson Steel Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 668 [150 Cal.Rptr. 250, 586 P.2d 564]; *Rivera* v. *City of Fresno* (1971) 6 Cal.3d 132, 140 [98 Cal.Rptr. 281, 490 P.2d 793].)

■ In the new regulations (Cal. Admin. Code, tit. 22, § 1256-1 et seq.), section 1256-9 describes the general factors to be considered in terminations of employment for domestic reasons. Such circumstances are considered "good cause" if "the claimant's obligation is of a real, substantial and compelling nature . . . and the claimant's reason for leaving work is due to a legal or moral obligation" related to, inter alia, "the existing or prospective marital status of the claimant." The comment to this regulation stresses that among the requirements are an "*obligation* due to domestic circumstances" in conjunction

with a "compelling reason" for terminating employment. (Italics added.) Domestic obligations which are deemed to provide "good cause" extend to circumstances involving named family members as well as spouses.

Section 1256-12 recites instances in which marriage or imminent marriage may constitute "good cause." In the event of relocation due to an imminent marriage, among the factors to be considered are the time of the departure from employment as related to the need for packing and other relocation or marriage related duties. The comment further recites that "This section reflects this state's policy in favor of the establishment and maintenance of the marital relationship."

Plaintiff here did not demonstrate the "imminency of her marriage" or any need for termination of employment at the time that she left work because of marriage related obligations. Plaintiff's decision to move to Washington came 10 months before her marriage was anticipated. It may be of some interest that, indeed, at oral argument more than two years later, we were informed that no marriage had as yet occurred. More significantly, nothing in her notification of termination to her employer or in her request for unemployment compensation benefits indicated that her presence in Washington was necessary because of concrete marriage plans which required "on-the-spot" arrangements.

We reaffirm our recognition of a strong public policy favoring marriage. (*Marvin, supra,* 18 Cal.3d at p. 684.) No similar policy favors the maintenance of nonmarital relationships. We therefore conclude that plaintiff did not, as a matter of law, establish "good cause" for her voluntary departure from her employment within the meaning of section 1256. In the absence of legislation which grants to members of a nonmarital relationship the same benefits as those granted to spouses, no basis exists in this context for extending to nonmarital relations the preferential status afforded to marital relations.

■ Plaintiff also asserts a constitutional claim, arguing that to deny her the benefits accorded to those who are married violates her right of privacy and freedom of association, citing *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219]. In essence, plaintiff's argument is that nonmarried persons must be afforded all the rights and benefits extended to married persons. We do not agree. Underlying the unemployment compensation scheme is the state's legitimate interest in promoting marriage. Unlike the plaintiffs in *City of Santa Barbara,* plaintiff herein has not been denied the right to live with the person of her choice, nor has she been denied benefits which she might otherwise enjoy but for her unmarried state.

██ Recognizing and favoring those with established marital and familial ties not only furthers the state's interest in promoting such relationships but assures a more readily verifiable method of proof. Plaintiff here has demonstrated no compelling obligations requiring termination of her employment; she was neither following a spouse nor moving because of imminent plans to marry. As in *Cummings,* numerous problems of standards and difficulties of proof would arise if we imposed upon an administrative agency the function of deciding which relationships merited treatment equivalent to the treatment afforded those with formal marriages. The inevitable questions would include issues such as the factors deemed relevant, the length of the relationship, the parties' eventual plans as to marriage, and the sincerity of their beliefs as to whether they should ever marry. The potential for administrative intrusions into rights of privacy and association would be severe if agencies bore the burden of ferreting out the "true depth" and intimacy of a relationship in order to determine whether the existence and nature of the relationship was the equivalent of marriage.

Nothing, of course, would prevent claimants in such situations from establishing "good cause" based on compelling circumstances which make the voluntary leaving akin to an involuntary departure. (See *Evenson* v. *Unemployment Ins. Appeals Bd., supra,* 62 Cal.App.3d at p. 1016.) Thus, for example, where there are children of a nonformalized relationship, and an employee leaves his or her position to be with a nonmarital loved one and their children, good cause might be shown. However, neither the statutes nor our decisions beginning with *Marvin* require that we extend to partners in nonmarital relationships such as plaintiff, the evidentiary benefits extended to marital partners.

The judgment of the trial court is reversed and the cause is remanded to the trial court with directions to deny the writ.

Mosk, J., Kaus, J., and Reynoso, J., concurred.

**BROUSSARD, J.**—I dissent.

Plaintiff is entitled to unemployment benefits if she left work for "good cause." (Unemp. Ins. Code, § 1256.) The trial court found that plaintiff's decision to move to Washington State to live with her fiance met that standard. The majority, however, reject that finding on the ground that plaintiff and her fiance were not yet married and did not plan to marry promptly upon her arrival in Washington.[1]

---

[1] I am uncertain whether the majority opinion rests upon a newly created rule of law barring benefits to nonmarital partners, or upon an evidentiary presumption. My first impression was that the majority hold that a partner to a heterosexual relationship has "good cause" to leave employment in order to join the other partner only if the two are married or engaged with a

In my opinion, section 1256 envisions a case-by-case determination of "good cause." While the courts may reasonably create an evidentiary presumption that a married person, or one about to be married, acts with "good cause" when he leaves work to join his spouse, we have no authority to create a rule denying a nonmarital partner the right to prove that he too acted with "good cause" in leaving employment. We cannot deny the fact that a nonmarital relationship can acquire such significance and importance in the lives and hopes of the persons involved that one partner may reasonably and in good faith decide that preserving the relationship justifies terminating current employment. If the partner can thus prove "good cause" without resort to any evidentiary presumption, he is entitled to unemployment benefits.

The trial court in the present case held that plaintiff proved that she left work for "good cause" as that term is defined in the relevant judicial decisions and administrative regulations. The majority do not point to any defect in plaintiff's proof. They show only that she was not married or about to be married—a showing sufficient to deprive her of the advantages of the presumption but insufficient to deprive her of benefits if she proves "good cause" without resort to the presumption. We should therefore affirm the judgment of the trial court awarding unemployment compensation.

To support this conclusion, I turn to specific language of section 1256, to the cases construing that language, and to the implementing regulations promulgated by the Unemployment Insurance Appeals Board. Section 1256 provides that "[a]n individual is disqualified for unemployment compensation benefits if . . . he has left his most recent work voluntarily without *good cause.*" (Italics added.) The term "good cause" in this section is the kind of broad, open-ended language that the Legislature uses when it foregoes making

---

definite and early date for the wedding. From this point of view, the majority opinion states a rule of law—a mistaken rule, which amends the statute to establish a limitation on unemployment benefits that the Legislature never enacted.

The penultimate paragraph of the majority opinion, however, suggests that the majority intend only to deny nonmarital partners the benefits of an evidentiary presumption. That paragraph states: "Nothing, of course, would prevent claimants in such situations [i.e., a nonmarital relationship] from establishing 'good cause' based on compelling circumstances which make the voluntary leaving akin to an involuntary departure. (See *Evenson* v. *Unemployment Ins. Appeals Bd., supra,* 62 Cal.App.3d at p. 1016.) Thus, for example, where there are children of a non-formalized relationship, and an employee leaves his or her position to be with a nonmarital loved one and their children, good cause might be shown. However, neither the statutes nor our decisions beginning with *Marvin* require that we extend to partners in nonmarital relationships such as plaintiff, the *evidentiary* benefits extended to marital partners." (*Ante,* p. 10, italics added.)

That paragraph implies that the majority intend only to deny nonmarital partners the benefits of an evidentiary presumption created in favor of parties to present or imminent marriage. The denial of an evidentiary presumption, however, would not bar a party from recovering if he can prove his case without reliance upon the presumption. The majority make no serious attempt to examine the facts of the present case to determine whether plaintiff has proved "good cause" independently from any presumption.

specific rules in favor of individualized, case-by-case consideration. Recognizing this legislative purpose, in the only decision of this court to discuss the concept of "good cause" in section 1256, we stated that "[i]n view of the statutory objectives . . . the concept of 'good cause' cannot be arbitrarily limited; the board must take account of ' "real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith." ' " (*Gibson* v. *Unemployment Ins. Appeals Bd.* (1973) 9 Cal.3d 494, 499, fn. 8 [108 Cal.Rptr. 1, 509 P.2d 945], quoting *Cal. Portland Cement Co.* v. *Cal. Unemployment Ins. Appeals Bd.* (1960) 178 Cal.App.2d 263, 272-273 [3 Cal.Rptr. 37].)

The Court of Appeal decision in *Zorrero* v. *Unemployment Ins. Appeals Bd.* (1975) 47 Cal.App.3d 434, 439 [120 Cal.Rptr. 855], elucidates this broad conception of "good cause." *Zorrero* explains that: "The term 'good cause' is not susceptible of precise definition. In fact, its definition varies with the context in which it is used. Very broadly, it means a legally sufficient ground or reason for a certain action. [¶] 'In general "good cause," as used in an unemployment compensation statute, means such a cause as justifies an employee's voluntarily leaving the ranks of the employed and joining the ranks of the unemployed; the quitting must be for such a cause as would reasonably motivate in a similar situation the average able-bodied and qualified worker to give up his or her employment with its certain wage rewards in order to enter the ranks of the compensated unemployed.' (81 C.J.S. Social Security And Public Welfare, § 167, p. 253.) [¶] ' "Good cause" cannot be determined in the abstract any more than can any other legal conclusion. It can be determined only in relation to a set of facts.' (*Cal. Portland Cement Co.* v. *Cal. Unemp. Ins. Appeals Board, supra,* 178 Cal.App.2d 263, at p. 274.)" (P. 439.) *Evenson* v. *Unemployment Ins. Appeals Bd.* (1976) 62 Cal.App.3d 1005, 1016 [133 Cal.Rptr. 488], employs the same language.[2]

The Unemployment Insurance Appeals Board's 1980 regulations promulgate an equally broad definition. " 'Good cause' exists for leaving work when a substantial motivating factor in causing the claimant to leave work, at the time of leaving, whether or not work connected, is real, substantial, and compelling and would cause a reasonable person genuinely desirous of retaining employment to leave work under the same circumstances." (Cal. Admin. Code, tit. 22, § 1256-3.)

---

[2]This broad definition of "good cause" does not justify terminating employment for insubstantial or whimsical reasons. *Evenson* states that the "reasons must be so imperative and compelling as to make the voluntary leaving 'involuntary' " (62 Cal.App.3d 1005, 1016)—which may be an overstatement—but both *Evenson* (*ibid.*) and *Zorrero* (47 Cal.App.3d 434, 439) agree that "[v]oluntary termination must be based on serious and exigent circumstances."

The 1980 regulations, however, go beyond this broad definition to set out certain circumstances under which leaving work because of domestic circumstances will constitute good cause. (§ 1256-9.)[3] They provide specifically that a claimant has good cause to leave work if the claimant is married and must accompany his or her spouse "to preserve family unity"[4] (§ 1256-12), or if "[t]he claimant's prospective marriage is imminent and involves a relocation to another area because the claimant's future spouse has established or intends to establish his or her home there, and it is impossible or impractical for the claimant to commute to work from the other area" (*id.*). The effect of these regulations is to establish a limited presumption in favor of a person about to become married. Such a claimant does not need to prove that his or her marriage is a substantial and important relationship, one worth preserving even at the expense of unemployment. The state will presume that marriages are worth saving, and require the claimant only to prove that he cannot reasonably commute to his former job from the new marital home.

These regulations depart from the case-by-case analysis required by the cited judicial decisions and by the principles set out in regulation 1256-3. That departure, however, furthers the state's policy favoring the preservation of marital relationships. (See generally *Marvin* v. *Marvin* (1976) 18 Cal.3d 660, 684 [134 Cal.Rptr. 815, 557 P.2d 106].) It finds support also in the recognized policy that "[t]he provisions of the Unemployment Insurance Code must be liberally construed to further the legislative objective of reducing the hardship of unemployment." (*Gilles* v. *Department of Human Resources Development* (1974) 11 Cal.3d 313, 325 [113 Cal.Rptr. 374, 521 P.2d 110, 90 A.L.R.3d 970]; *Gibson* v. *Unemployment Ins. Appeals Bd., supra,* 9 Cal.3d 494, 499; *Prescod* v. *Unemployment Ins. Appeals Bd.* (1976) 57 Cal.App.3d 29, 40 [127 Cal.Rptr. 540].) Together, the two policies justify providing benefits where necessary to preserve the marital relationship without requiring case-by-case proof of the value and stability of the relationship.

---

[3]Section 1256-9 provides in part that: "A claimant voluntarily leaves work with good cause based on domestic circumstances if the claimant's obligation is of a real, substantial, and compelling nature such as would cause a reasonable person genuinely desirous of retaining employment to take similar action, and the claimant's reason for leaving work is due to a legal or moral obligation relating to any of the following:
"(1) The health, care, or welfare of the claimant's family.
"(2) The exercise of parental control over the claimant who is an unemancipated minor.
"(3) The existing or prospective marital status of the claimant."

[4]Sections 1256-9, 1256-10, and 1256-12 all refer to preservation of "family unity" as a compelling reason justifying termination of employment. "Family" is defined in section 1256-9 in terms of legal relationships, but the commentary to that section states that regardless of legal ties "any person with whom the claimant has had substantially the same relationship of parent-child or grandparent-grandchild" is a member of his family. It does not mention persons to whom the claimant has had substantially the same relationship as that of husband and wife. Yet if we consider an unmarried couple with children, it would seem absurd to insist that it constitutes two separate families (father and children; mother and children) instead of a single family.

The state's policy in favor of marriage, however, does not imply a corresponding policy *against* nonmarital relationships. The courts recognize that such relationships are common and pervasive (see *Marvin* v. *Marvin, supra,* 18 Cal.3d 660, 683), give rise to legal and moral obligations (*id.,* at pp. 682-684), and generate reasonable expectations which warrant judicial protection (*id.,* at p. 684). The state should not seek to destroy such relationships or stigmatize their members, but should respect the fact that reasonable men and women, in deciding where to live and work, consider the values and benefits of a significant nonmarital relationship, and take account of the needs and aspirations of their partner.

Accordingly, I would hold that if a member of a nonmarital relationship can show that his motive in leaving employment "is real, substantial, and compelling, and would cause a reasonable person genuinely desirous of retaining employment to leave work under the same circumstances" (Cal. Admin. Code, tit. 22, § 1256-3; see *Zorrero* v. *Unemployment Ins. Appeals Bd., supra,* 47 Cal.App.3d 434, 439), he should be entitled to unemployment compensation. He cannot rely on any administrative or judicial presumptions for aid, but will have to prove that the relationship is a substantial and important one, such that a reasonable person genuinely desirous of retaining employment would still choose to leave work in order to preserve the relationship. If he can meet this burden of proof, however, he is entitled to the statutory benefits. As explained by Justice Feinberg in the Court of Appeal decision in this case: "All that section 1256 requires is 'an adequate cause . . . that comports with the purposes of the Unemployment Insurance Code and with other laws.' The purpose of the Unemployment Insurance Laws is to relieve the burden caused by unemployment (Unemp. Ins. Code, § 100), namely, to act as a buffer against the ravages of sudden and unexpected loss of one's livelihood. [Citation.] These ravages are experienced as directly by a de facto spouse as by a legal spouse."

I recognize that a case-by-case determination will impose an administrative burden: the Unemployment Insurance Appeals Board will have to determine whether a nonmarital relationship is substantial and important enough to justify the worker's decision to leave employment. (Cf. *In re Cummings* (1982) 30 Cal.3d 870, 875 [180 Cal.Rptr. 826, 640 P.2d 1101] (conc. opn. of Bird, C. J.).) It is always easier to apply black letter rules than to take account of " ' "real circumstances, substantial reasons, objective conditions, . . . just grounds for action, and always the element of good faith" ' " (*Gibson* v. *Unemployment Ins. Appeals Bd., supra,* 9 Cal.3d 494, 499, fn. 8). But judicial creation of a rule that would deny benefits to persons who can prove they acted reasonably, based on serious and exigent circumstances (*Zorrero* v. *Unemployment Ins. Appeals Bd., supra,* 47 Cal.App.3d 434, 439), in leaving employment would constitute judicial amendment of section 1256, contravening both the purpose of that section and the policy of liberal construction of the unemployment insurance laws.

The facts of the present case support the trial court's conclusion that plaintiff left employment with "good cause" and was thus entitled to unemployment benefits. As of September 1979, when she left her California job with Mohawk Data Sciences Corporation, plaintiff had been living with her fiance, Stephen Bee, for about three years. They lived together as a married couple, sharing all income and expenses, and planned to marry the following June. Bee went to Washington State to work as a carpenter in June of 1979, and decided to remain there permanently. He asked plaintiff to join him in Washington. As plaintiff testified, this request "kind of put me on the spot, either come up here and live with him . . . in Washington or to break up." After looking into job opportunities in Washington, plaintiff decided to leave her employment, and resigned effective September 7, 1979.[5]

I find it difficult to understand how one could dispute the conclusion that plaintiff acted with "good cause" in moving to Washington. Can anyone really maintain that a close, intimate, and potentially lifelong relationship is necessarily less important than a job—that a reasonable person would never quit a job to maintain such a relationship? Certainly on the record before us there is nothing to suggest that plaintiff's decision to move to Washington was unreasonable, or done without good and sufficient justification.

The majority, however, insist that in denying benefits to plaintiff, and to nonmarital partners generally, they are merely carrying out a legislative decision despite the fact that they cite no evidence that the Legislature ever made such a decision and no statute embodying any such decision.[6] The cases they

---

[5]The majority state that "[i]t may be of some interest that, indeed, at oral argument more than two years later, we were informed that no marriage had as yet occurred." (*Ante,* p. 9.) Interesting it may be, but it is legally irrelevant; if future marriage plans are material at all, they must be judged as of September 1979 when plaintiff left her employment in California.

The opinion also states that "[m]ore significantly, nothing in her notice of termination to her employer or in her request for unemployment compensation benefits indicated that her presence in Washington was necessary because of concrete marriage plans which required 'on-the-spot' arrangements." (*Ante,* p. 9.) Plaintiff went to Washington to live with her fiance, to share his life, to provide and receive emotional and financial support. This, the majority say, is not "good cause." But if she went to Washington to arrange for the catering at the wedding reception, that would be "good cause."

[6]The closest the majority can come in their search for a statute enacting a distinction between married and unmarried partners' entitlement to unemployment benefits is the 1975 amendments to Unemployment Insurance Code sections 1030 and 1032, which provide that benefits payable because an employee left work to join a spouse will not be charged to the employer's account. There are, however, many cases in which an employee who leaves for domestic reasons can obtain benefits that would still be chargeable to the employer. The majority supply one example: a nonmarital partner who leaves to accompany his unmarried partner and their children. (*Ante,* p. 10.) In fact, the terms of sections 1030 and 1032 do not even include an employee who leaves to join a prospective spouse with imminent marriage in view—another case in which the majority would approve benefits—although arguably the statutes could be construed to include a prospective spouse (and perhaps a de facto spouse) within their scope. In any case, it is clear that there is no legislative policy to deny benefits to a claimant simply because that claim does not fall within the scope of sections 1030 and 1032.

cite demonstrate only that the Legislature has on occasion decided to limit certain benefits to married persons and expressly stated those limits in the statute conferring the benefits. (See *People* v. *Delph* (1979) 94 Cal.App.3d 411, 415-416 [156 Cal.Rptr. 422, 4 A.L.R.4th 416] (marital communication privilege of Evid. Code, §§ 970 and 980); *Harrod* v. *Pacific Southwest Airlines, Inc.* (1981) 118 Cal.App.3d 155 [173 Cal.Rptr. 68] (wrongful death benefits under Code Civ. Proc., § 377); *Garcia* v. *Douglas Aircraft Co.* (1982) 133 Cal.App.3d 890 [184 Cal.Rptr. 390] (same); cf. *Marvin* v. *Marvin, supra,* 18 Cal.3d 660, 681 (Family Law Act).) Instead of supporting the majority's position, these decisions show that when the Legislature intends to deny benefits to nonmarital partners, it does so expressly.

A more pertinent decision, I believe, is that of the Court of Appeal in *Department of Industrial Relations* v. *Workers' Comp. Appeals Bd.* (1979) 94 Cal. App.3d 72 [156 Cal.Rptr. 183], since it construed a statute which, like the statute at issue in the present case, did not expressly limit benefits to married persons. Instead, Labor Code section 3503 granted workers' compensation death benefits to all persons who were "in good faith a member of the family or household of the employee." The court held a nonmarital partner who lived with the deceased employee was entitled to benefits as a "good faith" member of his household. If a nonmarital partner can be a "good faith" member of the household, I would think he would have "good cause" to leave work in order to move with the household.

The majority seek to distinguish this last precedent on the ground that it holds only that a person otherwise entitled to benefits is not barred by virtue of a nonmarital relationship. But that, I submit, is precisely the effect of the majority's holding. Plaintiff has shown "good çause" for leaving employment as that term has been defined in past cases, but the majority nevertheless deny benefits because that cause is based on a nonmarital relationship.

I do not claim that the state must equate marriage and nonmarital relationships in determining rights to unemployment compensation. To the contrary, the board and the courts may properly invoke a presumption of good cause to benefit a claimant who moves to maintain a present or imminent marriage, without granting a like presumption for persons in nonmarital relationships. But the presumption in favor of marriage should not lead us to refuse to recognize that there exist close, enduring, and significant nonmarital relationships, that such relationships may give rise to moral and (under *Marvin*) legal obligations, and that in a particular case the maintenance of such a relationship may constitute "good cause" for leaving employment. Finding that the plaintiff's reasons for terminating employment in the present case meet the test of "good

cause" under section 1256, I would affirm the judgment of the trial court granting unemployment benefits.

Bird, C. J., and Grant, J.,* concurred.

Respondent's petition for a rehearing was denied July 14, 1983. Bird, C. J., Broussard, J., and Grodin, J. were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.